2008-NMSC-013

177 P.3d 513

In the MATTER of Stuart
L. STEIN, Esquire.

An Attorney Licensed to Practice Before
the Courts of the State of New
Mexico, No. 02–2006–505.

No. 17,349.

Supreme Court of New Mexico.

Feb. 20, 2008.

464

Joel L. Widman, Disciplinary Counsel, Albuquerque, NM, for Petitioner.

The Stein Law Firm, Stuart L. Stein, Albuquerque, NM, for Respondent.

## OPINION

PER CURIAM.

{1} This matter came before the Court to consider whether attorney Stuart L. Stein (Respondent) should be disbarred for violating the Rules of Professional Conduct through his actions associated with his representation of Bruce Clinesmith and his wife, Ruth Clinesmith. For the reasons that follow, we adopt the findings and conclusions of the hearing committee and adopt the recommendation of the disciplinary board to disbar Respondent from the practice of law.

## I. BACKGROUND

{2} These disciplinary proceedings commenced with a letter sent by the Honorable Linda M. Vanzi of the Second Judicial District Court, setting forth a complaint regarding Respondent's conduct in a proceeding seeking the appointment of a guardian and conservator for Bruce Clinesmith. The petition for appointment of a guardian and conservator was filed by Bruce's daughter, Cathe Temmerman, because of concerns about her father's emotional and financial well-being.

{3} Respondent appeared on behalf of Bruce and Ruth, and other members of Ruth's family who purported to have an interest in the matter. Respondent filed an answer to the petition requesting that Ruth be appointed as guardian for Bruce, if in fact the court determined a guardian should be appointed. The answer further alleged the existence of a durable power of attorney executed by Bruce in favor of his wife and stated that the court should not disregard Bruce's clear intent, presumably as evidenced by the power of attorney. Upon the filing of the petition, the court appointed Richard Reidy as guardian *ad litem* for Bruce.

{4} At the time of the filing of the petition in the guardianship case, there were two trusts in existence that were created by Bruce. One was a 1997 revocable trust (the 1997 trust), which provided for the income and principal to be paid to Bruce as needed, with the remainder payable upon his death to the Moody Bible Institute of Chicago (Moody Bible). The corpus of this trust was $6,275,000.00. The second was a 1999 revocable trust (the 1999 trust), the income and principal of which were to be paid to Bruce. Upon his death, the remainder was to be held in trust for his wife. Upon Ruth's death, the remainder was to be paid to Moody Bible. The corpus of this trust was $4,800,000.00.

{5} On the same date that Respondent filed his answer to the guardianship and conservatorship petition, Respondent wrote to the trustee, demanding that the income and corpus of the 1997 Trust and the 1999 Trust be paid to Ruth, individually. When the trustee refused the request, Respondent filed two lawsuits in the United States District Court for the District of New Mexico, which the hearing committee found would affect the manner in which Bruce's estate would be managed, expended, and distributed. Respondent took these actions notwithstanding his knowledge of the pendency of the guardianship and conservatorship proceeding and without notice to Bruce's guardian *ad litem*.

{6} Respondent, as Bruce's and Ruth's attorney, filed the first federal lawsuit to void the trusts created by Bruce in favor of Moody Bible, and to have the funds declared community property. The Moody Bible lawsuit was filed on Ruth's behalf, individually, and purportedly on Bruce's behalf, "by Ruth M. Clinesmith, his attorney-in-fact," pursuant to the durable power of attorney.

{7} Respondent filed the second federal lawsuit against Citigroup Global Markets, Inc., on behalf of Ruth in her individual capacity, alleging the existence of a joint account in the names of Bruce and Ruth that was restricted by Citigroup without authority. Citigroup had placed a freeze on the account because of its concerns that Bruce's mental health had deteriorated and because of its uncertainty that he fully comprehended his actions. In the Citigroup lawsuit, Ruth

sought damages, or in the alternative, full access to the account. However, once again, Respondent did not notify Bruce's guardian *ad litem* of the filing of this lawsuit.

{8} Significantly, neither lawsuit named Bruce as a plaintiff individually. Also, the two complaints filed by Respondent acknowledge Bruce's potential incapacity. The complaint prepared and filed by Respondent in the Moody Bible lawsuit alleges that in August 2004, when Bruce and Ruth relocated to Albuquerque, Bruce was suffering from "early signs of dementia, be it Alzheimer's Disease or some other dementia diagnosis." In the Citigroup complaint, Respondent states "[t]hat there is a current question about the competence of Bruce C. Clinesmith."

{9} Although the Citigroup complaint requested Ruth's full access to the account as co-tenant with Bruce, Respondent negotiated a settlement which transferred the account to another broker, exclusively under Ruth's name, thus effectively precluding Bruce from accessing the account. During the negotiations Respondent produced a copy of the power of attorney executed by Bruce in his wife's favor. The settlement was confirmed in letters sent by Respondent to Citigroup's associate general counsel. This conduct by Respondent resulted in the removal of assets in excess of $250,000.00 from the state district court's jurisdiction in the guardianship and conservatorship proceeding without notice to, or leave of, that court.

{10} During a subsequent hearing Judge Vanzi considered a motion to disqualify Respondent from representing Bruce because of a conflict between his interests and those of Ruth. Of note, during the hearing, was Respondent's statement that "I agree that [Bruce] is incapacitated to the extent that he may need a guardian or conservator." Thereafter, the court disqualified Respondent from representing Bruce, revoked the power of attorney previously granted to Ruth by Bruce, and appointed Decades LLC temporary guardian and conservator of Bruce. The court set forth the following rationale for disqualifying Respondent from representing Bruce.

> The interests of Bruce C. Clinesmith and Ruth M. Clinesmith are adverse to each other in this proceeding and in the federal proceedings currently pending. Representing both individuals in these proceedings constitutes an impermissible conflict of interest and neither Stuart L. Stein, Esq. or The Stein Law Firm can continue to represent the interests of Bruce C. Clinesmith.

The court also ordered the court clerk to "issue letters of full temporary guardianship and temporary conservatorship to Decades LLC upon accepting its duties hereunder" and "in connection with its duties as temporary guardian and temporary conservator, Decades LLC shall consult with the Guardian Ad Litem and promptly retain counsel to represent Mr. Clinesmith's interests in the federal proceedings...." Pursuant to this order, the attorney for Decades LLC sent a letter to Respondent advising him that Decades LLC, in its capacity as Bruce's temporary guardian and conservator, considered Respondent's representation of Bruce to be terminated effective July 18, 2005, and stated that the termination applied to all matters, including the guardianship and conservatorship case, the Moody Bible lawsuit, and the Citigroup lawsuit.

{11} Respondent never advised the federal court in which the Moody Bible lawsuit was pending that he had been disqualified from representing Bruce, that the power of attorney had been revoked, or that a temporary guardian and conservator had been appointed for Bruce. Respondent continued to represent Bruce in the Moody Bible lawsuit after he was disqualified from doing so, by remaining attorney of record and filing a motion to vacate a scheduling order. In addition, at no time did Respondent advise Citigroup, to whom he negotiated a transfer of funds from Bruce to Ruth, that the power of attorney he previously produced had been revoked.

{12} After being ordered to discontinue his representation of Bruce, Respondent went to the dementia unit of the Woodmark, a residential care facility in which Bruce was a patient, and had Bruce removed from the dementia unit and taken to a private room to execute a new will and trust which Respondent had prepared for Bruce's signature.

The new will and trust sought to revoke the Moody Bible trusts and create a new trust with Ruth as trustee with all the power "that an absolute owner of such property would have." These documents had the additional effect of removing all of the assets belonging to Bruce from the jurisdiction of the court in the guardianship and conservatorship proceeding. Respondent did not notify the court, the guardian *ad litem*, or the temporary guardian and conservator of his intended visit with Bruce, or of his efforts to have Bruce sign a new will and trust.

{13} Upon learning of the meeting and execution of the will and trust, Decades LLC filed a motion asking for an emergency hearing and seeking an order prohibiting Respondent from interfering with its duties as temporary guardian and conservator and preventing Respondent from having any contact with Bruce. The court held a hearing on the motion and Respondent admitted going to the Woodmark without notifying Decades LLC. Remarkably, he told the court that he "didn't have to" because it was not explicitly stated in the order. Respondent also admitted that he did not notify the guardian *ad litem*. When asked if it was his practice to approach incapacitated persons without notifying the court-appointed guardian/conservator or any other person caring for the individual, Respondent stated, "[i]n this case this is what I did and I feel that it is fine. It is ethical, and not in contravention of your order...." Thereafter, the court entered an order enjoining Respondent from having any contact with Bruce and voiding the will and trust executed by Bruce. The order states specifically that "Stuart L. Stein, Esq., The Stein Law Firm, and all members or staff of the Stein Law Firm are hereby enjoined from having contact with Bruce C. Clinesmith in any way, shape or form...."

{14} Shortly thereafter, the court disqualified Respondent from any continued representation of Ruth. The court found that "Mrs. Clinesmith's interests, and those of her family, are materially adverse to the interests of Mr. Stein's former client, Bruce Clinesmith" and that "[i]nformation relating to the representation of Mr. Clinesmith by Mr. Stein is being used to Mr. Clinesmith's disadvantage and to the advantage of Mrs. Clinesmith." Despite being disqualified from representing Ruth in state court, Respondent never advised the federal court in which the Moody Bible lawsuit was pending of his disqualification. In fact, Respondent continued to represent Ruth by filing a motion to vacate an initial scheduling order both on her behalf and on behalf of Bruce under Ruth's durable power of attorney. The federal court, however, disqualified Respondent from representing any party in the Moody Bible lawsuit for the same reasons he was disqualified by Judge Vanzi in the guardianship and conservatorship proceeding.

{15} By reason of the foregoing conduct, a specification of charges was filed by deputy disciplinary counsel pursuant to Rule 17-105(B)(3)(d) NMRA. The specification of charges detailed the conduct summarized above and alleged that such conduct violated many of the Rules of Professional Conduct. *See* Rules 16–107(A) and (B), 16–109(A), 16–804(C), (D), and (H), 16–102(D), and 16–402 NMRA.

{16} Respondent's conduct in both the Moody Bible and the Citigroup lawsuits resulted in the hearing committee, after a full hearing, to conclude that Respondent had violated the following Rules of Professional Conduct: (1) Rule 16–107(A) by representing Ruth, whose interests were adverse to those of another client (Bruce); (2) Rule 16–107(B), in that Respondent represented a client (Bruce) where the representation of that client was materially limited by his representation of another client (Ruth); and (3) Rule 16–109(A) by his conduct in the Moody Bible lawsuit, in that Respondent represented a client (Ruth) in the same or a substantially related matter in which that person's interests were materially adverse to those of a former client (Bruce) and without the consent of the former client.

{17} Based upon Respondent's conduct in the Moody Bible lawsuit, the Citigroup lawsuit, and his actions at the Woodmark, the hearing committee found violations of Rule 16–804(C), in that Respondent engaged in conduct involving misrepresentation by neglecting to notify the courts and interested

parties of the pending litigations, of the occurrences in the guardianship and conservatorship proceeding, and of his visit to Bruce and execution of a new will and trust. The hearing committee also found that Respondent's conduct in the aggregate violated Rule 16–804(D), in that he engaged in conduct prejudicial to the administration of justice, and Rule 16–804(H), in that he engaged in conduct adversely reflecting on his fitness to practice law. Because of Respondent's conduct in the Moody Bible lawsuit, the hearing committee also found that Respondent violated Rule 16–102(D) by assisting his client Ruth to engage in conduct he knew was misleading to the federal court.

{18} Finally, the hearing committee found that by Respondent's actions in relation to the Woodmark visit, he violated Rule 16–402, by communicating directly with Bruce about executing a new will and trust without the consent of Bruce's newly-appointed lawyer.

{19} The hearing committee recommended that Respondent be suspended from the practice of law for a period of six months with automatic reinstatement and that he pay costs. The findings and conclusions of the hearing committee were forwarded to the disciplinary board hearing panel for review. *See* Rule 17–314(A) NMRA (stating that the chair of the disciplinary board shall appoint a hearing panel upon receipt of the hearing committee's findings of fact, conclusions and recommendations). In its order and decision, the hearing panel accepted and adopted the committee's findings and conclusions. The hearing panel found that Respondent "basically agreed with each Finding of Fact of the Hearing Committee with his limited objections being either stylistic or immaterial to the conclusions." However, the panel rejected the hearing committee's recommended discipline, and instead recommended to this Court that Respondent be disbarred from the practice of law for no less than five years and that he pay costs.

## II. DISCUSSION

{20} Respondent argues that there was a "complete failure of proof at the hearing committee level to prove any of the charges in the Specification of Charges." He specifi-

cally argues that there was no proof of any conflict of interest or misrepresentations created by representing both Bruce and Ruth in the guardianship and conservatorship case before Judge Vanzi and by his actions in the two federal cases. For the reasons that follow, we hold that there is substantial evidence to support the hearing committee's findings, and that those findings support the committee's conclusions that Respondent violated the conflict of interest and misrepresentation provisions of the Rules of Professional Conduct. We also hold that there is substantial evidence to support the committee's remaining findings, and that those findings support the remaining conclusions.

### A. Standard of Review

{21} The findings of the hearing committee are reviewed for substantial evidence and the conclusions of law are reviewed de novo. *See In re Bristol*, 2006–NMSC–041, ¶¶ 16–18, 140 N.M. 317, 142 P.3d 905 (per curiam); *In re Estrada*, 2006–NMSC–047, ¶ 7, 140 N.M. 492, 143 P.3d 731 (per curiam). Both the hearing panel and this Court look to see whether substantial evidence exists to support the hearing committee's decision. *See In re Bristol*, 2006–NMSC–041, ¶ 16, 140 N.M. 317, 142 P.3d 905.

### B. Conflict of Interest

{22} Under the New Mexico Rules of Professional Conduct, an attorney "should not represent a client whose interests are adverse to those of a present client, or whose interests are adverse to those of a former client on a matter that is the same or substantially related to the previous matter." *United States v. Gallegos*, 39 F.3d 276, 279 (10th Cir.1994) (summarizing New Mexico's disciplinary rules regarding conflict of interest); *accord* Rule 16–107(A) and (B). An objective standard is used when determining whether the lawyer reasonably could believe that the representation of a client with interests adverse to those of another client would not adversely affect the lawyer's relationship with the other client. *See In re Houston*, 1999–NMSC–032, ¶ 12, 127 N.M. 582, 985 P.2d 752. As such, Respondent's subjective belief that no conflicts existed is irrelevant.

Viewed objectively, the facts speak for themselves.

{23} Respondent purported to represent Bruce and Ruth in the guardianship and conservatorship proceeding before Judge Vanzi, yet filed two lawsuits in federal court seeking to drastically alter Bruce's estate in favor of Ruth. In the Moody Bible lawsuit, Respondent was representing Ruth individually, and purportedly Bruce, "by Ruth Clinesmith, his attorney-in-fact." Respondent was seeking to void the trusts created by Bruce and to have the corpus of the trusts declared community property. Ruth's interest in gaining control of the trusts was obviously adverse to Bruce's interest in keeping the trusts as he prepared them. With the filing and settlement of the Citigroup suit, Respondent was representing Ruth, individually, whose interests were adverse to Bruce's, violating Rule 16–107(A). Although the Citigroup complaint filed by Respondent requested Ruth's full access to the account as Bruce's co-tenant, Respondent negotiated the removal of the assets from Bruce and Ruth's joint account and the placement of those assets in an individual account in Ruth's name only. Ruth's interests were clearly adverse to Bruce's interests and Respondent was representing both of them, an obvious violation of Rule 16–107(A).

{24} Additionally, Respondent's representation of Bruce was materially limited by his representation of Ruth, a violation of Rule 16–107(B). We have no difficulty seeing how representing Ruth limited Respondent's ability to represent Bruce. Ruth clearly had an adverse interest in the outcome of the guardian and conservatorship proceeding and the federal suits, as each would affect her ability to control Bruce's finances. We agree with the hearing committee that Respondent should have seen the adverse implications of dual representation in this situation.

{25} Furthermore, the complaint prepared and filed by Respondent in the Moody Bible lawsuit alleges that in August 2004, when Bruce and Ruth relocated to Albuquerque, Bruce was suffering from "early signs of dementia, be it Alzheimer's Disease or some other dementia diagnosis." Additionally, Re-

spondent acknowledged in the complaint he filed in the Citigroup case that Bruce's competence was questionable. Accordingly, the court had appointed a guardian *ad litem* for Bruce before Respondent filed these lawsuits. Later, the court found that good cause existed to appoint a temporary guardian and conservator for Bruce and appointed Decades LLC in that capacity. What is so reprehensible to this Court is that Respondent, acknowledging that Bruce's mental capacity was in question, attempted to take money from him and transfer it to Ruth, while purporting to represent both of them. Certainly, Respondent's ability to represent Bruce was compromised.

{26} Respondent argued before the hearing committee that any potential conflict was waived by both Bruce and Ruth and that Bruce was competent. However, as noted above, whether the lawyer reasonably could believe that the representation would not adversely affect the lawyer's relationship with the other client is determined by an objective standard. *See In re Houston*, 1999–NMSC–032, ¶ 12, 127 N.M. 582, 985 P.2d 752. Applying the objective standard in *Houston*, we conclude that it was not reasonable for Respondent to believe these conflicts could be waived. As this Court said, "reasonable" means "the conduct of a reasonably prudent and competent lawyer." *In re Houston*, 1999–NMSC–032, ¶ 12, 127 N.M. 582, 985 P.2d 752. Simply put, a reasonably prudent lawyer would not have acted as Respondent did.

{27} Through his actions in the Moody Bible lawsuit and the state court guardianship proceedings, Respondent also violated Rule 16–109(A), which provides "that [a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." As noted in the federal order disqualifying Respondent from representing any party and from participating in any manner in the Moody Bible lawsuit, Bruce had an attorney-

client relationship with Respondent, the Moody Bible lawsuit involved a matter substantially related to Respondent's prior representation of Bruce in the state court proceeding, and Ruth's interests were materially adverse to Bruce's interests. As such, Respondent engaged in an obvious violation of Rule 16-109(A) by representing a person (Ruth) in the same or a substantially related matter in which that person's interests were materially adverse to those of a former client (Bruce) and without the consent of the former client.

{28} Although the hearing committee did not specifically conclude that Respondent's actions in having Bruce execute a new will and trust in Ruth's favor constituted a violation of the conflict of interest provisions of the Rules, we exercise our independent authority to so conclude. *See Bristol*, 2006-NMSC-041, ¶ 18, 140 N.M. 317, 142 P.3d 905 (recognizing de novo review of hearing committee's conclusions of law). Respondent was disqualified from representing Bruce when he went to the Woodmark. If he was purporting to represent Ruth, as he claimed he was when Judge Vanzi was considering whether to revoke the new will and trust, then this is another obvious instance where Respondent was in violation of Rule 16-109(A).

## C. Misrepresentation and Misleading the Court

{29} Respondent also argues there was not substantial evidence to prove that he engaged in misrepresentations during the course of his attempts to represent Bruce and Ruth in the various state and federal court proceedings. Rule 16-804(C) states, "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The hearing committee found that due to Respondent's actions in the Moody Bible lawsuit, the Citigroup lawsuit, and the Woodmark visit, Respondent violated Rule 16-804(C) by engaging in conduct involving misrepresentation. There is ample proof for this conclusion.

{30} The history of this case begins with a guardianship and conservatorship proceeding before Judge Vanzi. NMSA 1978, Section 45-5-402 (1975) grants exclusive jurisdiction to the court in which a petition for guardianship or conservatorship is filed "to determine how the estate of the protected person which is subject to the laws of New Mexico shall be managed, expended or distributed to or for the use of the protected person or any of his dependents." Aware of the guardianship proceeding and the appointment of a temporary guardian for Bruce, Respondent filed two lawsuits in federal court, in effect seeking to remove those assets from the jurisdiction of the state district court. He did so without notifying Judge Vanzi, Richard Reidy, Bruce's guardian *ad litem*, or the petitioner in the guardianship and conservatorship proceeding.

{31} In addition, Respondent never notified the federal courts of the pending guardianship and conservatorship proceeding. Indeed, when Judge Vanzi appointed Decades LLC as Bruce's temporary guardian and conservator, Respondent never notified the federal courts of such appointment. In fact, when Respondent was disqualified from representing Bruce, and later Ruth, he never notified the federal courts. When Judge Vanzi revoked Ruth's power of attorney, Respondent never notified Citigroup, with whom he negotiated a settlement in the case, that the power of attorney he relied on to negotiate the settlement had been revoked.

{32} The hearing committee also concluded that Respondent engaged in conduct constituting misrepresentation when he visited the Woodmark. The testimony by deputy disciplinary counsel's witnesses is not contradicted by Respondent's testimony or by that of his witnesses. After having been disqualified from representing Bruce, after Decades LLC had been appointed Bruce's temporary guardian and conservator, and notwithstanding his own recognition of Bruce's incapacity, Respondent nevertheless induced Bruce to execute a new will and trust. The new will and trust would have removed all of Bruce's assets from the jurisdiction of the state court and would have made Ruth trustee with all the power "that an absolute owner of such property would have." Respondent managed to have Bruce sign new legal documents

without notifying Richard Reidy, the guardian *ad litem,* or Decades LLC, the temporary guardian and conservator. Nor did Respondent obtain leave of the court to visit Bruce. Taken together, all of these actions support the hearing committee's conclusion that Respondent's conduct associated with the Woodmark visit amounted to misrepresentation in violation of Rule 16–804(C).

■ {33} Additionally, by reason of Respondent's conduct in the Moody Bible lawsuit, we find that Respondent violated Rule 16–102(D), which states, "A lawyer shall not engage, or counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent or which misleads the court.... " Respondent did not notify the federal court handling the Moody Bible lawsuit when he was disqualified from representing Bruce or when he was subsequently disqualified from representing Ruth. By continuing with the Moody Bible lawsuit, Respondent assisted Ruth in engaging in conduct he knew to be misleading to the federal court. His motion to vacate an initial scheduling order on behalf of Bruce and Ruth is evidence of his continuing actions taken to mislead the federal court.

{34} Throughout these proceedings, Respondent has suggested he did not misrepresent his authority to represent Bruce or Ruth because he never expressly discussed the actions the state and federal courts had taken to disqualify him. For example, the hearing committee asked Respondent questions regarding the power of attorney that Respondent had sent to the attorney for Smith Barney in settlement of the Citigroup suit. This power of attorney was revoked by Judge Vanzi and Respondent never notified either Smith Barney or Citigroup that the power of attorney had been revoked. When asked about the circumstances surrounding this situation, Respondent said, "I didn't mislead him in saying that the power of attorney is in current force and effect." Respondent also said, "He didn't ask me if it was still in full force and effect. If you don't ask the right question, I won't give you the right answer." Statements like this reveal Respondent's disturbingly skewed perception of what it means to be truthful.

■ {35} "Lawyers are officers of the court and are always under an obligation to be truthful to the court." *Woodson v. Phillips Petroleum Co.,* 102 N.M. 333, 339, 695 P.2d 483, 489 (1985). " 'Candor and honesty are a lawyer's stock and trade. Truth is not a matter of convenience. Sometimes lawyers may find it inconvenient, embarrassing, or even painful to tell the truth.' " *In re Mikus,* 2006–NMSC–012, ¶ 9, 139 N.M. 266, 131 P.3d 653 (per curiam) (quoting *In re Scavone,* 106 N.J. 542, 524 A.2d 813, 820 (1987)). As we have previously recognized, misrepresentation can be by either commission or omission. *Id.*

{36} Respondent had a duty to inform the court and interested parties in the guardianship and conservatorship proceeding of the filing of the federal lawsuits, but he did not. Respondent also had a duty to inform those parties of his visit to the Woodmark, a visit he should not have made in the first place, but he did not. Respondent had a duty to disclose to the federal court in the Moody Bible lawsuit what had transpired regarding the guardianship and conservatorship proceeding, particularly his disqualification, but he did not. Respondent had a duty to inform Citigroup and the federal court handling the case that the power of attorney had been revoked, but he did not. In short, Respondent did a serious disservice to his clients and the courts by withholding such necessary information. We accordingly conclude that Respondent's silence and continued course of conduct within the various proceedings under these circumstances rises to the level of misrepresentation.

{37} Based upon the aggregate of Respondent's conduct, the hearing committee also concluded that Respondent engaged in conduct that was prejudicial to the administration of justice, violating Rule 16–804(D), and engaged in conduct adversely reflecting on his fitness to practice law, violating Rule 16–804(H). This Court has concluded that similar conduct violates Rule 16–804(D) and (H) in other disciplinary cases. *See, e.g., In re Archuleta,* 122 N.M. 52, 54–55, 920 P.2d 517, 519–20 (1996) (per curiam) (recognizing that attorney's intentional failure to report to the bankruptcy court fees he received amounted

to violation of rules of professional conduct prohibiting conduct prejudicial to the administration of justice); *In re C'de Baca,* 109 N.M. 151, 152, 782 P.2d 1348, 1349 (1989) (per curiam) (noting that use of knowledge of former client's assets to request loans for ventures in gold ore processing and a private pay-phone company and conduct involving dishonesty or misrepresentation in dealings with client was conduct prejudicial to the administration of justice and conduct adversely reflecting on fitness to practice law).

{38} We therefore uphold the hearing committee's conclusions that the aggregate of Respondent's conduct was prejudicial to the administration of justice and reflected adversely on Respondent's fitness to practice law in violation of Rule 16–804(D) and (H).

## D. Communication with Person Represented by Counsel

■ {39} In addition, we hold that Respondent's actions in relation to the Woodmark visit constitute a violation of Rule 16–402, which provides that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." Respondent's actions in going to the Woodmark, speaking with Bruce about executing a new will and trust, and, in fact, getting him to execute the new will and trust without notifying Bruce's guardian and conservator, is inexcusable. Whether Respondent purported to represent Bruce or Ruth at this time is of no consequence. The subject matter of the visit was Bruce's finances, and when executing a new will and trust, the legal representatives appointed by the court or hired by Decades LLC should have been present. Respondent did not obtain consent from Decades LLC to take these actions and he had no alternate legal authorization to do so. Accordingly, we agree with the hearing committee's conclusion that Respondent's conduct in this regard also violated Rule 16–402.

## E. Respondent's Procedural Challenges

{40} Respondent has argued throughout these proceedings that the disciplinary board disregarded the New Mexico Rules Governing Discipline, engaged in prosecutorial misconduct, and violated his due process rights. Respondent argues that those purported procedural violations warrant a dismissal of the charges against him. The Court concludes that Respondent's arguments have no merit and that he has failed to show any prejudice as a result of these alleged procedural violations.

■ {41} First, Respondent alleges that the board did not follow Rule 17–307(C) NMRA, which requires that the Respondent be advised of the "general nature of the allegations" and be given "a fair opportunity to present any matter of fact or mitigation the respondent-attorney wants disciplinary counsel to consider." Deputy disciplinary counsel sent Respondent a copy of the complaint filed by Judge Vanzi and requested a response.

{42} Respondent's interpretation of Rule 17–307(C) would require that deputy disciplinary counsel "articulate all acts considered to be violations of every Rule of Professional Conduct for which they intend to incorporate in a formal specification of charges...." However, the Rule states that "the respondent-attorney shall always be advised of the *general* nature of the allegations." Rule 17–307(C) (emphasis added). Judge Vanzi's letter gave detailed information regarding the general nature of the allegations so as to put Respondent on notice as to the charges against him. Rule 17–307(C) does not require more.

■ {43} Respondent alleges that deputy disciplinary counsel did not write a summary report or include any opposing positions as required by Rule 17–307(D) before referring the case to a reviewing officer. Respondent also argues that by this violation, deputy disciplinary counsel violated his confidentiality rights under Rule 17–304 NMRA. Additionally, Respondent argues that because there was never an intention by deputy disciplinary counsel to resolve the matter with a dismissal or informal admonition under Rule 17–104(B) NMRA, it was a violation of Rule 17–307(D) for deputy disciplinary counsel to

seek review by a reviewing officer. However, deputy disciplinary counsel explains that the case was referred to Norman S. Thayer because of his expertise in the area, and he was requested to give an advisory opinion on conflict of interest questions. As such, deputy disciplinary counsel did not use Mr. Thayer as a reviewing officer for the purpose of approving or disapproving dismissals of complaints for formal investigation and offers of informal admonitions, making Rule 17–104(B) inapplicable.

{44} Moreover, pursuant to Rule 17–307(A), deputy disciplinary counsel was authorized, as part of the initial investigation, to refer this matter "to an appropriate assistant counsel or commissioned investigator for report and recommendations." Mr. Thayer is, therefore, more properly viewed as a "commissioned investigator" or "assistant counsel" under Rule 17–307(A). Thus, the referral did not violate Respondent's confidentiality rights because this is an action deputy disciplinary counsel is authorized to take pursuant to Rule 17–307. Moreover, the referral to a commissioned investigator or assistant counsel was of potential benefit to Respondent because deputy disciplinary counsel was, in essence, getting a second opinion as to whether certain matters were appropriate to pursue. Given that the referral was authorized by the rules and could have benefitted Respondent, we perceive no procedural violation or prejudice as a result of deputy disciplinary counsel's decision to refer the case for advice as a part of his investigation of the matter. *See In re Castellano*, 119 N.M. 140, 144, 889 P.2d 175, 179 (1995) (per curiam) (holding that an assertion of prejudice is not a showing of prejudice).

{45} Next, Respondent argues that the disciplinary board failed to follow Rule 17–307(E), requiring that chief disciplinary counsel approve charges prior to filing. Although deputy disciplinary counsel acknowledges that there was no written documentation of approval, there was evidence that chief disciplinary counsel did, in fact, approve the charges. Also, as deputy disciplinary counsel correctly points out, there is no requirement in Rule 17–307(E) that the approval be in writing. *See* Rule 17–307(E)

(stating that deputy disciplinary counsel shall present a draft of the proposed specification of charges to chief disciplinary counsel prior to filing, and chief disciplinary counsel shall approve the filing of the charges or recommend an alternate course of action). We therefore find no error on this point.

{46} Next, Respondent argues that fraud was not pleaded with particularity in the specification of charges as required by Rule 1–009(B) NMRA, which states, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Respondent's argument is that this rule applies to pleadings in disciplinary cases and that it was not followed. *See* Rule 17–301(B) NMRA (stating that the Rules of Civil Procedure for the District Courts of New Mexico apply to disciplinary proceedings, except where clearly inapplicable). Without deciding whether Rule 1–009(B) applies to disciplinary cases in New Mexico involving allegations of fraud or misrepresentation, we simply note that deputy disciplinary counsel met the standard in this case by particularizing the instances of misrepresentation sufficiently in the specification of charges so as to leave no doubt in Respondent's mind as to the charges asserted against him. *See Steadman v. Turner*, 84 N.M. 738, 740, 507 P.2d 799, 801 (Ct.App. 1973) (noting that in pleading a claim of fraud, the evidentiary details of the claim need not be alleged); *Romero v. Sanchez*, 83 N.M. 358, 359, 492 P.2d 140, 141 (1971) (concluding that in the aggregate, the allegations alleged with sufficient particularity a fraudulent plan, scheme, or design). *See Delgado v. Costello*, 91 N.M. 732, 734, 580 P.2d 500, 502 (Ct.App.1978) (recognizing that even if the word fraud is not used in the pleadings, the allegations should leave no doubt in the defendants' minds as to the fraud claims asserted against them). In conclusion, the specification of charges filed by deputy disciplinary counsel met the pleading requirements of Rule 1–009(B), because the particular factual allegations were alleged in detail and the rules were stated with specificity so as to leave no doubt as to the charges against Respondent.

{47} Respondent also argues that the disciplinary board engaged in prosecutorial misconduct during these proceedings. First, Respondent argues that the failure of chief disciplinary counsel to review any proposed formal specification of charges before filing by deputy disciplinary counsel constitutes prosecutorial misconduct. As addressed above, chief disciplinary counsel did ultimately approve the charges and there is no requirement that the approval be in writing.

{48} Secondly, he argues that deputy disciplinary counsel gave false statements in two instances. The first instance involves the sequestered file in the guardianship and conservatorship proceeding before Judge Vanzi, and whether the materials from the file could be used in Respondent's disciplinary proceeding. Respondent filed a motion in limine stating that materials from a sequestered file could not be used outside the proceeding. Deputy disciplinary counsel stated to the hearing committee that Judge Vanzi's complaint letter was accompanied with materials from the sequestered case, and therefore it could be used in the disciplinary case. The hearing committee denied Respondent's motion.

{49} However, Respondent found a letter to deputy disciplinary counsel from Judge Vanzi specifically informing deputy disciplinary counsel that he could not use the materials from the sequestered file and that they had to be kept confidential. Armed with this letter, Respondent filed a motion for rehearing, and the hearing committee reversed its ruling, stating that no documents from the sequestered file would be "entered into evidence unless and until there's an order from Judge Vanzi releasing specific documents and setting forth the conditions under which they may be admitted in this proceeding and to be used in this proceeding." Respondent argues that deputy disciplinary counsel's statements were intentional misrepresentations to the hearing committee and constitute prosecutorial misconduct.

{50} The hearing committee admonished deputy disciplinary counsel for not disclosing the letter. Deputy disciplinary counsel stated to the hearing committee, "There's no question I received the letter. It was just not something that was on my radar screen at the time, and that's all I can say about the letter." Deputy disciplinary counsel said further, "there was no intent on my part to mislead the hearing committee." Respondent asked that the hearing committee dismiss his case for prosecutorial misconduct and the committee denied this motion. In denying Respondent's motion, the chair of the hearing committee stated:

> Mr. Stein, I have made my displeasure with the way Mr. Widman handled and addressed the confidentiality issue very clear already in this case. I don't think it was handled properly. I think it could have been handled much more professionally and expeditiously, but it was not. Nonetheless, I do not believe that there is any ground to dismiss for prosecutorial misconduct.

The other committee members concurred.

{51} A deferential standard of review is used by this Court to review the hearing committee's findings of fact. *See In re Bristol,* 2006–NMSC–041, ¶ 15–17, 140 N.M. 317, 142 P.3d 905. As this Court stated:

> [T]he hearing committee is the only entity designated to take evidence during the course of a formal disciplinary proceeding. *See* Rule 17–314(C); *see also* Rule 17–313. Because the hearing committee directly observes witness testimony, it is in the best position to weigh the evidence, resolve matters of credibility, and choose between the conflicting inferences that may be drawn from the evidence.

*Id.* ¶ 15. As such, the evidence must be viewed in the light most favorable to the hearing committee's implicit decision that deputy disciplinary counsel did not intentionally mislead the committee regarding confidentiality of the documents from Judge Vanzi.

{52} Respondent's third alleged instance of prosecutorial misconduct deals with another disputed issue in these proceedings: whether deputy disciplinary counsel misrepresented his intent not to rely on collateral estoppel during the course of the disciplinary proceedings below. Respondent argued be-

low that the orders entered by the state and federal judges in the Clinesmith matters could not be used as proof in this disciplinary case because he did not have a chance to fully litigate the validity of the orders. Respondent's argument is premised on the principle that a party against whom collateral estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior actions. *See Deflon v. Sawyers*, 2006–NMSC–025, ¶ 14, 139 N.M. 637, 137 P.3d 577.

■■■ {53} Deputy disciplinary counsel responded below that collateral estoppel was not being used against Respondent. Instead, deputy disciplinary counsel argued that Respondent was barred from collaterally attacking the orders he was charged with violating. Deputy disciplinary counsel pointed out that Respondent has continually attempted to collaterally attack Judge Vanzi's orders by showing that he did not have a fair hearing on the issues that were the subject of the orders. As deputy disciplinary counsel stated in his brief to the hearing panel, "[a] party who disobeys an order may not collaterally attack the validity of the underlying order in the course of an appeal from a judgment holding the party in criminal contempt of court for violating the order." *In re Philip Kleinsmith*, 2005–NMCA–136, ¶ 11, 138 N.M. 601, 124 P.3d 579 (citing *State v. Cherryhomes*, 114 N.M. 495, 498, 840 P.2d 1261, 1264 (Ct.App.1992)). Deputy disciplinary counsel also pointed out to the hearing committee that Respondent could have appealed his disqualification by Judge Vanzi, but he did not do so. *See Weeks v. Indep. Sch. Dist.*, 230 F.3d 1201, 1207 (10th Cir.2000) ("Counsel have standing to appeal orders that directly aggrieve them."); *see also Cherryhomes*, 114 N.M. at 498, 840 P.2d at 1264 (holding that "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings" and the "[w]illful violation of a court's order . . . cannot be tolerated" (internal quotation marks and citations omitted)). Although the hearing committee did not make a specific finding as to deputy disciplinary counsel's conduct on this issue, we conclude that deputy disciplinary counsel was simply making a valid legal argument regarding the

effect of the district court orders and was not breaching some purported commitment not to use collateral estoppel against Respondent.

{54} In addition to rejecting the factual bases for Respondent's claim of prosecutorial misconduct, we also question Respondent's reliance on the concept of prosecutorial misconduct within the context of a disciplinary proceeding. Relying on the three instances of what Respondent characterizes as prosecutorial misconduct described above, Respondent cites to *State v. Breit*, 1996–NMSC–067, ¶ 37, 122 N.M. 655, 930 P.2d 792, for support. In *Breit*, this Court adopted a standard of willful disregard for determining when retrial is barred because of prosecutorial misconduct. *Id.* ¶ 32. The prosecutor's conduct in *Breit* was described as "pervasive, incessant, and outrageous," which is how Respondent characterizes deputy disciplinary counsel's actions. *Id.* ¶ 37.

{55} The alleged actions of deputy disciplinary counsel in no way compare to the actions of the prosecutor in *Breit*. By contrast, Respondent only points to three instances of purported misconduct. As discussed above, viewing the evidence in the light most favorable to the hearing committee's findings regarding the issue of prosecutorial misconduct, there is no indication that deputy disciplinary counsel proceeded in bad faith or engaged in the level of misconduct contemplated by *Breit*, assuming of course, that *Breit* even applies in this context.

{56} Finally, Respondent argues continually throughout these proceedings that he was denied discovery and that the specification of charges should have been dismissed for failure to put him on notice of his actual actions that corresponded to the claimed violations of the Rules of Professional Conduct. We have already rejected Respondent's challenges to the adequacy of the specification of charges for the reasons discussed earlier in this opinion. In addition, we conclude that no facts were found or conclusions drawn that were not alleged in the specification of charges. We also previously rejected Respondent's claims of inadequate discovery when we denied Respondent's petition for extraordinary

writ and emergency request for stay filed with this Court earlier in these proceedings.

{57} The record reflects that Respondent received the entire disciplinary board file prior to the hearing. All of the exhibits were available to him, there was nothing he had not seen before, and there was no allegation by Respondent that he was, in fact, specifically prejudiced by any lack of discovery. *See Castellano,* 119 N.M. at 144, 889 P.2d at 179 (holding that an assertion of prejudice is not a showing of prejudice).

■ {58} Respondent has repeatedly attempted to assert prejudice in terms of his surprise at the hearing committee's conclusions of law and not as to the evidence relied on by the hearing committee. In fact, the hearing panel brought this to Respondent's attention, stating that "discovery is for facts, not for law." To ensure that Respondent was not prejudiced by any purported lack of discovery, the hearing panel finally asked Respondent to go through each of the findings of the hearing committee and "identify specifically the ones that are not supported or that you are prejudiced because there wasn't discovery, and somehow you would have proved something different." In response, Respondent discussed his objections to some of the findings, but did not point to specific instances where a lack of discovery prejudiced his ability to challenge the evidence in support of these findings. After this thorough questioning, the hearing panel concluded that "[t]he hearing committee did not abuse its discretion in denying Respondent discovery. Respondent was not prejudiced or surprised by the evidence presented by Deputy Disciplinary Counsel and Respondent was given a full opportunity to answer all charges."

{59} We find no basis for overturning the panel's decision in this regard. In fact, Respondent was asked before this Court, "Was there anything at the hearing that surprised you, in terms of not knowing of its existence before?" Respondent replied, "I don't think so, but I didn't know what the impact was." While Respondent may have been in denial about the gravity of his actions, we have no doubt that Respondent was not surprised by evidence submitted in the hearings below,

and that he was in no way prejudiced by any purported lack of discovery.

## F. Appropriate Discipline

■ {60} Although the hearing panel adopted the hearing committee's findings and conclusions with regard to Respondent's conduct and violation of the Rules of Professional Conduct, the hearing panel disagreed with the hearing committee's recommendation to discipline Respondent with a suspension. Instead, the hearing panel recommended to this Court that Respondent be disbarred. The disagreement between the hearing committee and the hearing panel notwithstanding, this Court independently determines the appropriate level of discipline. *See Bristol,* 2006–NMSC–041, ¶¶ 18, 30, 140 N.M. 317, 142 P.3d 905. In this regard, this Court looks to the *ABA Standards for Imposing Lawyer Sanctions* (1992) for guidance in determining appropriate lawyer disciplinary sanctions. *In re Key,* 2005–NMSC–014, ¶ 5, 137 N.M. 517, 113 P.3d 340.

## 1. Intentional Conduct

■ {61} Within the framework of the *ABA Standards,* disbarment is generally deemed appropriate for intentional misconduct, suspension for knowing misconduct, and reprimand for negligent misconduct. As deputy disciplinary counsel pointed out to the hearing panel, this Court has repeatedly noted that a pattern of intentional conduct warrants disbarment. *See, e.g., In re Arrieta,* 105 N.M. 418, 420, 733 P.2d 866, 868 (1987) (per curiam); *In re C'de Baca* 109 N.M. at 153, 782 P.2d at 1350. Furthermore, "[w]hen an attorney is found to have engaged in acts of intentional dishonesty, there is a presumption that he or she is unfit for membership in the bar of this state." *In re Romero,* 2001–NMSC–008, ¶ 10, 130 N.M. 190, 22 P.3d 215 (per curiam) (internal quotation marks and citation omitted).

■ {62} There is ample evidence to prove that Respondent knowingly and intentionally violated the Rules of Professional Conduct. Respondent knowingly failed to avoid a conflict of interest by purporting to represent Bruce and Ruth in the guardian-

ship and conservatorship proceeding, yet at the same time filing two lawsuits seeking to drastically alter Bruce's estate in favor of Ruth, while acknowledging Bruce's potential incapacity. *See* Section 4.31 (stating that a lawyer's intentional simultaneous representation of clients with adverse interests and a lawyer's intentional representation of a client with materially adverse interests to those of another client or former client in a substantially related matter can be cause for disbarment). Further, Respondent intentionally continued to represent Bruce and Ruth after he was disqualified from doing so, which constitutes misrepresentation to the court. *See* Section 6.11 (stating that a lawyer's intentional falsification, deceit, or withholding of material information can be cause for disbarment). In addition, while the guardianship and conservatorship case was pending, Respondent engaged in misrepresentation and intentional deceit to the court by filing the two federal suits without notifying the court or other interested parties, and having Bruce change his will and trust after being ordered to discontinue his representation of Bruce. *Id.; see also* Section 5.11 (stating that "disbarment is generally appropriate when a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice").

{63} Respondent argued before the hearing committee that Judge Vanzi's order was not clear, that it contained no prohibition on Respondent changing Bruce's testamentary documents, and that he did nothing wrong. His claims to the contrary notwithstanding, Respondent intentionally violated the plain terms of Judge Vanzi's order, which reads:

> The interests of Bruce C. Clinesmith and Ruth M. Clinesmith are adverse to each other in this proceeding and in the federal proceedings currently pending. Representing both individuals in these proceedings constitutes an impermissible conflict of interest and neither Stuart L. Stein, Esq. or The Stein Law Firm can continue to represent the interests of Bruce C. Clinesmith.

*See* Section 6.21 (stating that "disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding").

{64} As noted above, ignoring a judge's order, whether one agrees or disagrees with it, is impermissible. There are avenues for appealing judges' orders and Respondent did not avail himself of those options. *See Weeks,* 230 F.3d at 1207 ("Counsel have standing to appeal orders that directly aggrieve them."); *Cherryhomes,* 114 N.M. at 498, 840 P.2d at 1264 (holding that "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings" and the "willful violation of a court's order ... cannot be tolerated") (internal quotation marks and citations omitted). Respondent cannot now attack the validity of Judge Vanzi's orders simply because his unethical conduct is now cause for his disbarment.

## 2. Aggravation and Mitigation

{65} In considering the appropriate level of discipline, this Court may consider aggravating and mitigating factors to either increase or reduce the degree of discipline imposed. *See ABA Standards,* Sections 9.1 to 9.3. In formulating its recommendations, the hearing committee considered several factors in aggravation, including Respondent's history of prior disciplinary offenses, his commission of multiple offenses, his refusal to acknowledge the wrongful nature of his conduct, and his substantial experience in the practice of law.

{66} In reviewing the hearing committee's disciplinary recommendations, the hearing panel found further aggravating factors of dishonest or selfish motive and vulnerability of the victim. The panel concluded that no mitigating factors existed. The hearing panel ultimately concluded that Respondent should be disbarred from the practice of law for not less than five years and that a motion for permission to apply for reinstatement not

be filed for a period of at least five years from the effective date of the disbarment pursuant to Rule 17–214 NMRA. *See In re Bristol,* 2006–NMSC–041, ¶ 3, 140 N.M. 317, 142 P.3d 905 (stating that the hearing panel may accept, reject, modify or increase the sanctions contained in the recommendations of the hearing committee). We agree with the hearing panel's assessment that disbarment is the appropriate level of discipline in this case.

{67} Throughout these proceedings, and before this Court, Respondent has maintained he did nothing wrong. Respondent's attitude during these proceedings and answers to questions asked regarding issues in the case give cause for alarm.

{68} For example, when asked by the hearing panel about Judge Vanzi's order previously cited in this opinion, and what the words "this proceeding" meant, the panel asked if that means "this proceeding dealing with [Bruce Clinesmith's] estate." Respondent said, "[n]o, I don't know what it means." Respondent then answered that "[t]he proceeding was a guardianship and conservatorship proceeding." The panel then asked, "Isn't that concerned with the assets in the estate of the person?" to which Respondent replied, "[s]ure it is. But I didn't do anything." This is just one of many examples where Respondent refuses to accept the order as it is, puts unreasonable interpretations on it, and then insists that he has done nothing wrong.

{69} Another example of Respondent's state of denial concerns his visit to the Woodmark to have Bruce execute a new will and trust. When Respondent was before Judge Vanzi, Respondent did not dispute that he did not notify Bruce's guardian *ad litem,* or his temporary guardian and conservator, of his visit to the Woodmark. When asked by Judge Vanzi why he did this, Respondent replied, "[i]n this case this is what I did and I feel that it is fine. It is ethical and not in contravention of your order." In light of what Respondent knew and what he intentionally did, it is, to say the least, troubling that he has steadfastly maintained that he has acted ethically.

{70} As further evidence of Respondent's denial and refusal to account for his actions, Respondent filed a motion for rehearing with this Court following the announcement of his disbarment. Respondent again makes the same arguments he has continually made throughout these proceedings and raises no new issues. In particular, Respondent claims that Bruce's incapacity was not at issue during the proceedings. However, Respondent acknowledged in the federal suits he filed and in his statements to Judge Vanzi that Bruce's capacity was in question. Similarly, Respondent claims he did not know that his failure to abide by court orders would be used as grounds for discipline. As is obvious from what is set forth above, there is no doubt that Respondent had knowledge of the charges against him regarding his conduct related to the court orders and that such conduct could result in disciplinary action.

{71} "It is the obligation of the organized bar and the individual lawyer to give unstinted cooperation and assistance to the Supreme Court, and its agency the disciplinary board, in discharging its function and duty with respect to discipline and in purging the profession of the unworthy." Preface, *Rules Governing Discipline,* 17–101 to –316. Contrary to this obligation, throughout these proceedings Respondent has expressed disdain and contempt for the disciplinary board. He has expressed publicly, through the use of his web site, his·displeasure with disciplinary board members. Much like the situation before us in *In re Quintana,* 104 N.M. 511, 513–14, 724 P.2d 220, 222–23 (1986):

Rather than recognizing his own shortcomings, he continues to blame others for his acts and omissions. In addition, he has openly chastised disciplinary counsel and this Court for what he evidently perceives as unjustified "punishment." Our obligation is to protect the public and the reputation of the profession, and safeguard the administration of justice. [Respondent's] sustained inability to grasp any appreciation of how his conduct falls below the standards set for attorneys or any understanding of his professional obligations convinces us that an extension of

the previously imposed sanction is required for the protection of the public.

{72} Were this Respondent's first time before this Court, we might be less inclined to impose the ultimate sanction of disbarment. However, Respondent has other disciplinary offenses. Notably, Respondent received a formal reprimand a mere two years ago for conduct similar to his conduct here. In that case, Respondent created a trust for a client that involved a change to an estate plan, making his son and daughter co-successor trustees. Respondent then represented the adverse interests of the son, while he was still representing the father. As stated in the formal reprimand, "You put yourself in a untenable ethical position by attempting to represent the competing interests of [father] and [son]. This is precisely the type of conduct that the conflict of interest rules are intended to prevent." Several factors in aggravation were found in that proceeding, including history of prior disciplinary offenses, selfish motive, committing multiple offenses, engaging in deceptive practices in responding to the disciplinary process, and substantial experience in the practice of law. This Court has noted that repeated instances of the same conduct for which a lawyer previously has been disciplined generally will result in more severe discipline. *In re Houston,* 1999–NMSC–032, ¶ 19, 127 N.M. 582, 985 P.2d 752.

### III. CONCLUSION

{73} In light of the evidence of repeated intentional misconduct by Respondent, we accept the hearing panel's recommendation for disbarment. Respondent is therefore disbarred from the practice of law pursuant to Rule 17–206(A)(1) NMRA. As previously ordered by this Court, Respondent must comply with all requirements of Rules 17–212 and 17–214 NMRA prior to being permitted to apply for reinstatement. Moreover, as previously ordered by the Court, Respondent shall pay the costs in this matter on or before March 19, 2008; any balance remaining thereafter shall accrue interest at the rate of 8–3/4% per annum; and such costs shall be reduced to a transcript of judgment.

{74} Finally, Respondent's motion for rehearing is denied.

{75} **IT IS SO ORDERED.**